ENTERED ON DOCKET
6/15/00
PURSUANT
TO FRCP RULES 58 & 79a

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

1

2  JESUS MARTI NAVARRO,

3   Plaintiff,

4  v.                                             Civil No. 96-1653 (HL)

5  UNITED STATES OF AMERICA, ET

6  AL.,
    Defendants.

7

8

9  <u>**OPINION AND ORDER**</u>

10        This litigation arises out of Plaintiff Jesús Martí Navarro's ("Martí")

11
12  termination from his job as a Special Agent with the Federal Bureau of Investigation

13  ("FBI"). Martí alleges that his termination was in violation of several provisions of

14  federal law. Although Martí's complaint attempts to set forth seven separate causes of

15  action, Martí in fact sets forth only four distinct claims.

16        First, Martí asserts that his firing constitutes a deprivation of property without

17
18  due process of law. See U.S. Const. Amend. V. Second, Martí argues that

19  Defendants deprived him of liberty without due process of law. See *Id.* Third, Martí

20  claims that Defendants abridged his right to equal protection of the laws under the

21
22  equal protection component of the Fifth Amendment's Due Process Clause. See *Id.*;

23  *Bolling v. Sharpe*, 347 U.S. 497 (1954) (holding that "the concepts of equal protection

24  and due process . . . are not mutually exclusive . . . . [D]iscrimination may be so

25  unjustifiable as to be violative of due process."); 3 Ronald D. Rotunda & John E.

26



AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

Nowak, Treatise on Constitutional Law §18.1 (3rd ed. 1999) (stating that

"classifications established by federal law are reviewed under the implied equal

protection guarantee of the Fifth Amendment due process clause").  The Court treats

these claims for constitutional violations as claims under *Bivens v. Six Unknown*

*Federal Narcotic Agents*, 403 U.S. 388 (1971).  Fourth, Martí brings a claim of

discrimination on the basis of race and national origin under Title VII of the Civil

Rights Act of 1964.  42 U.S.C.A. 2000e et seq. (West 1994).

Before the Court are Defendant's Motion to Dismiss, Dkt. No. 9, Plaintiff's

Opposition, Dkt. No. 14, Defendant's Reply, Dkt. No. 27, and Plaintiff's Sur-reply,

Dkt. No. 30.  Further, Defendant has filed a separate Motion to Dismiss Plaintiff's

Amended Complaint, Dkt. No. 20, and Plaintiff has submitted an Opposition, Dkt.

No. 23.

For reasons to follow, the Court hereby grants Defendants' Motion to Dismiss

Martí's claim of deprivation of property without due process of law, his claim of

deprivation of liberty without due process of law, his equal protection claim, and his

Title VII claim.  Accordingly, all of Martí's claims are hereby dismissed with

prejudice.

**Statement of Facts**

The pertinent facts of this case are as follows.  On July 28, 1986, Martí became

a Special Agent with the FBI.  In October of 1989, Martí was transferred from

Newark, New Jersey to San Juan, Puerto Rico.  The events that give rise to this case

2

Civil No. 96-1653 (HL)

occurred while Martí was assigned as a Special Agent on an investigation to which the

FBI referred as "Broomstick." As part of this investigation, in 1991, Martí on behalf

of the FBI gave a $2,500.00 security deposit for electricity to the owner of a property

that the FBI was leasing for use in its covert operations.

Skipping past events that have no bearing on this case, in 1993, after the FBI

no longer needed to use the leased property, Martí returned to the owner of the

property to collect the FBI's $2,500.00 security deposit. The owner of the property

made out a check to Martí himself for $2,500.00. Upon receipt of this check, Martí

substituted $2500.00 in cash of his own money for the check, and went to the FBI

office to give the cash to the FBI. Martí deposited the check into his personal

checking account.

When Martí attempted to give the money to Special Agent Allan Gómez ("SA

Gómez") at the FBI office, Martí was told to hold onto the money for a while. Martí

did this, eventually storing the money in a briefcase in a closet in his home. After

suffering a severe head injury in a hit-and-run collision, Martí was approached by SA

Gómez regarding the funds on October 12, 1993. Martí, at that time, was confused

and stated that he had turned the money into the FBI office. The next day, Martí told

SA Gómez that the money was in his home. The day after that, Martí returned the

money to the FBI.

Eventually, an investigation by the FBI of the events surrounding the handling

of the security deposit funds resulted in Special Agent in Charge Robert J. Opfer

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

("SAC Opfer") issuing to Martí a formal letter of censure on April 22, 1994. In April

of 1994, SAC Opfer also named Martí acting Principal Legal Advisor of the FBI's San

Juan division, a position that he occupied until his dismissal. On November 16, 1994,

newly-arrived Special Agent in Charge Richard D. Schwein ("SAC Schwein")

delivered to Martí a letter from FBI Headquarters dated November 10, 1994 and

advising Martí that the FBI was considering dismissing him. Then, on March 6, 1995,

Martí received a letter from FBI Headquarters dated February 27, 1995 dismissing

Martí from the FBI for conversion of FBI funds. Martí filed a request for

reconsideration on April 4, 1995. His request was denied on August 30, 1995, and he

received the denial on September 9, 1995. On May 24, 1996, Martí filed this lawsuit.

**Discussion**

Defendants have filed a Motion to Dismiss Martí's claims under several

provisions of Fed. R. Civ. P. 12(b). The Court shall treat the Motion to Dismiss as

having been brought pursuant to Rule 12(b)(6). In ruling on a Rule 12(b)(6) motion to

dismiss, a court must accept all well-pled factual averments as true and must draw all

reasonable inferences in the plaintiff's favor. *Carparts Distribution Ctr., Inc. v.*

*Automotive Wholesaler's Ass'n,* 37 F.3d 12, 14 (1st Cir. 1994). A court should not

dismiss a complaint for failure to state a claim unless it is clear that the plaintiff will

be unable to prove any set of facts which would entitle him to recovery. *Conley v.*

*Gibson,* 355 U.S. 41, 45-46 (1957); *Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44

(1st Cir. 1991). In his complaint a plaintiff is obliged to allege facts regarding each

4

Civil No. 96-1653 (HL)

essential element necessary to entitle him to recovery under an actionable legal

1    theory. *Roth v. United States*, 952 F.2d 611, 613 (1st Cir. 1991) (quoting *Gooley v.*

2    *Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988)).

3

4        Martí's first claim is that he was deprived of property without due process of

5    law. While the parties agree that an FBI Special Agent normally has no expectation

6    of continued employment,[1] Martí argues that the letter of censure issued to him by the

7    FBI vested him with a property interest in continued employment with the FBI.[2]

8
9    According to Martí, the FBI's issuance of the letter of censure effectively barred the

10   FBI from imposing further discipline on Martí for any events arising from the

11   handling of the $2,000.00 security deposit. Thus, Martí argues that he had a

12   legitimate expectation that his employment would not be terminated for reasons

13   relating to the security deposit incident.

14

15       Even if Martí has alleged facts adequate to support his contention that he had a

16   legitimate expectation of continued employment with the FBI, he has not alleged facts

17

18   _____

         [1] The position of FBI Special Agent is specifically exempted from the reach of the civil
19   service laws, so that FBI Special Agents have no expectation of continued employment and no
     due process property rights in their positions. See *Mack v. United States*, 814 F.2d 120, 123
20   (2nd Cir. 1987).

21
         [2] The Supreme Court has held that "[p]roperty interests are not created by the
22   Constitution, 'they are created and their dimensions are defined by existing rules or
     understandings that stem from an independent source such as state law . . . .'" *Cleveland Bd.*
23   *of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Board of Regents v. Roth*, 408
     U.S. 564, 577 (1972)). Under some circumstances, a government employer can create an
24   "understanding" that binds the government employer and creates a property interest in
25   continued employment. *Perry v. Sindermann*, 408 U.S. 593, 599-600 (1972).

26                                          5

Civil No. 96-1653 (HL)

sufficient to show that he was deprived of a property interest *without due process of law*. It is not enough merely to demonstrate that one's property was taken; one must show that one suffered a deprivation without due process of law.

It is well established that "[d]ue process normally requires notice and opportunity for 'some kind of hearing.'" *Herwins v. City of Revere*, 163 F.3d 15, 18 (1ˢᵗ Cir. 1998) (quoting *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19 (1978)), *cert. denied*, 119 S.Ct. 1497 (1999). Further, "[w]here feasible, the opportunity (for obvious reasons) is expected to be pre-deprivation . . . ." *Id.* When one is deprived of a property interest because of the "random and unauthorized" acts of government actors, however, feasibility dictates that "the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies . . . ." *Lowe v. Scott*, 959 F.2d 323, 340 (1ˢᵗ Cir. 1992).

In this case, Martí's dismissal is not the result of random and unauthorized acts by any government actor. The Supreme Court has defined random and unauthorized acts as those that are "not the result of some established [government] procedure and the [government] cannot predict precisely when the [act] will occur." *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). A random and unauthorized act "is in almost all cases beyond the control of the [government]." *Id.*

On the contrary, Martí's termination is the result of carefully considered government action. Thus, the Court must examine the adequacy of the FBI's pre-

6

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

termination procedures.  This examination requires a consideration of whether these

procedures provide for notice and an opportunity to be heard "in a meaningful

manner." *Parratt*, 451 U.S. at 540.

In his Amended Complaint, Dkt. No. 18, Martí attacks the adequacy of the

FBI's pretermination procedures.  Martí alleges that he was not properly presented

with the evidence against him, including the names and sworn statements of the

witnesses against him, and that he was not given a "pretermination hearing." Dkt. No.

18.  Martí's own submissions, however, establish the adequacy of the FBI's

pretermination procedures.[3]

Martí submits a copy of the letter informing him that the FBI was considering

his dismissal.  Dkt. No. 23, Exhibit 4.  In that letter, A.B. Llewellyn ("Llewellyn"),

Unit Chief in the Administrative Summary Unit of the FBI, sets forth in careful detail

his conclusions of fact, the evidence upon which his conclusions are based, and his

reasoning for considering Martí's dismissal.  Further, at the end of the letter,

Llewellyn states, "[y]ou have ten calendar days following your receipt of this letter to

provide a written reply to my proposal . . . .  Full and careful consideration will be

---

[3] Although the Motion to Dismiss in this case is based on Rule 12(b)(6), the Court
may under certain circumstances consider documentary evidence.   The First Circuit has held
that "[w]hen, as now, a complaint's factual allegations are expressly linked to – and
admittedly dependent upon – a document (the authenticity of which is not challenged), that
document effectively merges into the pleadings and the trial court can review it in deciding a
motion to dismiss under Rule 12(b)(6)." *Beddall v. State Street Bank & Trust Co.*, 137 F.3d
12, 17 (1st Cir. 1998).

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

given to any response which you submit to this notice before a final decision is

rendered." *Id.*

Martí alleges that he filed a reply to the letter proposing dismissal in which he

set forth the reasons for his disagreement with the FBI's pending employment

decision. Martí then alleges that he received on March 6, 1995 a letter of dismissal

signed by Edward R. Leary, of the Personnel Management Section of the FBI's

Personnel Division. In that letter, Martí was again presented with the evidence

against him and with counter-arguments to those presented in Martí's reply. Finally,

the letter informed Martí of his ability to request an "agency reconsideration" of his

dismissal. Dkt. No. 23, Exhibit 5.

Martí alleges that after filing a letter requesting reconsideration of his

termination, he received on September 9, 1995 a letter denying his request. In that

letter, Martí was again informed of the evidence against him, the reasoning used by

the FBI, and the counter-arguments to those presented in Martí's request for

reconsideration. Dkt. No. 23, Exhibit 6.

In spite of the specificity of the FBI's notices to Martí before his dismissal

(leaving aside the post-dismissal letter), Martí still claims that the FBI's pre-

deprivation procedures are inadequate to satisfy the minimum requirements of due

process. This argument simply does not stand up. Martí clearly had notice and an

opportunity to be heard. He filed submissions in which he took full advantage of his

opportunity to be heard. Finally, the FBI's responses demonstrate that the FBI

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

carefully considered Martí's arguments. The FBI's procedures certainly meet the

requirements of due process, and the FBI complied with those procedures.[4]

1

2

3       Martí further argues that the FBI's post-deprivation procedures are insufficient

4   to meet the demands of due process. In light of the adequacy of the FBI's pre-

5   deprivation procedures, however, the Court shall not examine the FBI's post-

6   deprivation procedures. Thus, Martí's claim that he was deprived of property without

7
    due process of law can not survive.
8

9       Martí's second claim, that he was deprived of liberty without due

10  process of law, is based on his contention that he was entitled to a name-clearing

11  hearing to refute the reasons given by the FBI for his dismissal. According to Martí,

12
    his termination damaged his reputation in the community and prevented him from
13

14  finding other employment. He further alleges that the FBI disseminated information

15  about the reasons for his dismissal.

16      Martí alleges that after his termination from the FBI, he attempted to procure

17
    employment with the Federal Emergency Management Agency ("FEMA"). Two
18

19  months after being hired, Martí claims, he was terminated. Martí alleges that he was

20  terminated because of information given to FEMA by the FBI regarding his dismissal

21

22  _____

        [4] Martí alleges that the FBI's internal rules require that the subject of personnel action
23  be informed of the names of the witnesses against him. Martí was not told that SA Gómez'
    testimony influenced Martí's dismissal until he received the letter denying his request for
24  reconsideration. Even if this set of facts sets forth a violation of the FBI's own procedures,
25  the Court does not consider this to rise to the level of a violation of due process.

26                                        9

Civil No. 96-1653 (HL)

from the FBI. Martí's specific allegation is that Assistant Special Agent in Charge

Héctor Pesquera ("ASAC Pesquera") of the FBI conveyed the information

surrounding Martí's dismissal from the FBI to the United States Attorney's Office for

the District of Puerto Rico. The United States Attorney, in turn, conveyed this

information to FEMA.

Unfortunately for Martí, he has alleged no facts that suggest that the FBI

disseminated information about his dismissal in a way that implicates Martí's liberty

interest under the due process clause. For a dissemination of such information to

implicate one's liberty interest, it must happen "in a formal setting (and not merely as

the result of unauthorized 'leaks'), and thereby significantly have interfered with the

employee's ability to find future employment." *Silva v. Worden*, 130 F.3d 26, 33 (1st

Cir. 1997) (citing *Beitzell v. Jeffrey*, 643 F.2d 870, 879 (1st Cir. 1981)). See also,

*Lopez-Pacheco v. United States*, 627 F.Supp. 1224 (D.P.R. 1986) (deciding that

plaintiff failed to state a claim of invasion of privacy under the Puerto Rico

Constitution and thus failed to state a claim under the Federal Torts Claim Act

because information about plaintiff was only disseminated "to a few federal

agencies," so that publication was not "sufficiently diffuse"), *aff'd*, 815 F.2d 692 (1st

Cir. 1987). Martí's allegations do not constitute the kind of formal dissemination that

is required to make out a claim of a deprivation of one's liberty. Accordingly, this

claim fails.

Martí's third claim is that he was denied the equal protection of the laws under

10

Civil No. 96-1653 (HL)

the Fifth Amendment due process clause.  Martí sets forth this claim in the following

terms:

> By actually discharging plaintiff from his position defendants acted in
> an unreasonable, arbitrary and capricious manner and have, thereby,
> deprived plaintiff of equal protection of the laws guaranteed under the
> fifth amendment to the United States Constitution.

Martí fails, however, to articulate an equal protection claim.  The guarantee of

equal protection of the laws operates as a limit on "the government's ability to classify

persons or 'draw lines' in the creation and application of laws."  3 Treatise on

Constitutional Law § 18.2.  In other words, "[e]qual protection is the guarantee that

similar people will be dealt with in a similar manner and that people of different

circumstances will not be treated as if they were the same." *Id.* (citing Joseph

Tussman & Jacobus tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev.

341 (1949)).  Martí's claim has nothing to do with government line-drawing or

classifications.  He simply claims that he was arbitrarily terminated.  The Supreme

Court of the United States has consistently made clear that "'[t]he purpose of the

equal protection clause of the Fourteenth Amendment is to secure every person within

the State's jurisdiction against intentional and arbitrary discrimination, whether

occasioned by express terms of a statute or by its improper execution through duly

constituted agents.'" *Village of Willowbrook v. Olech*, 120 S.Ct. 1073, 1074-75

(2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)).[5]

---

[5] Although the cited case refers to the equal protection guarantee set forth in the
Fourteenth Amendment, for equal protection purposes "[f]ederal laws are . . . tested under the

11

Civil No. 96-1653 (HL)

See also *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 43 (1st Cir.

1992) (stating that the plaintiff "points to no allegations of fact in the complaint, nor

to anything in the record, bearing out the conclusory assertion that others similarly

situated were treated differently from himself. It follows that there can be no equal

protection violation."). Martí's equal protection claim thus can not survive.

Martí's fourth claim asseverates that he was discriminated against in violation

of Title VII. Defendants move to dismiss this claim on the ground of failure to

exhaust administrative remedies. Defendants argue that Martí failed to consult an

EEOC counselor within 45 days of the alleged discrimination that he suffered. See 29

C.F.R. § 1614.105 (1999). Defendants do not argue that Martí failed to consult an

EEOC counselor. Rather, they assert that Martí sought counseling too late. Thus, the

Court shall treat Defendants' motion as based on timeliness, rather than outright

failure to exhaust.

The parties agree that Martí first sought EEOC counseling on October 23,

1995. The parties' disagreement concerns at what point the 45-day clock started

running. According to Martí, the 45-day period began on September 9, 1995, when he

received the denial of his request for reconsideration of his termination. Defendants,

on the other hand, argue that the 45-day period began prior to September 9, 1995, thus

barring Martí's Title VII claim. Defendants contend that the 45-day period began on

_____

same standards as state laws . . . ." 3 Treatise on Constitutional Law § 18.1.

12

Civil No. 96-1653 (HL)

November 16, 1994, the date on which Martí received the letter initially proposing his

dismissal from the FBI. In the alternative, they argue that the period began on March

6, 1995, the date on which Martí received his actual letter of dismissal from the FBI.

Under Title VII, statutes of limitations start to run at "'the time of the

discriminatory acts, not [at] the time at which the consequences of the acts became

most painful.'" *Johnson v. General Electric*, 840 F.2d 132, 134 (1st Cir. 1988)

(quoting *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980)). The analyses in

*Johnson* and *Ricks* make clear that whatever may be the date on which the 45-day

period began, it is certainly *not* September 9, 1995.

In *Johnson*, the First Circuit grappled with whether a Title VII statute of

limitations starts to run at the time that an employer institutes an allegedly

discriminatory employment plan or at the time that the plan's application actually

works upon the plaintiff a denial of some benefit or position. *Johnson*, 840 F.2d at

134. According to the First Circuit, the time period begins running at the time that

"some tangible effects of the discrimination [are] apparent to the plaintiff." *Id.* at 137.

In the instant case, Martí felt tangible effects of Defendants' alleged discrimination

when he received the letter dismissing him from the FBI on March 6, 1995.

The Supreme Court in *Ricks* faced the question of when a Title VII claim

accrues: at the time of the employee's being informed by his employer of the

employment decision or at the time that the employment decision actually took effect.

*Ricks*, 449 U.S. 250. The Court decided that "the only alleged discrimination

13

Civil No. 96-1653 (HL)

occurred – and the filing limitations period[] therefore commenced – at the time the

[employment] decision was made and communicated to [the plaintiff]." *Id.* at 258.

Again, Martí learned of the FBI's actual employment decision on March 6, 1995.

Of course, the 45-day period can not have begun prior to Martí's notice of the

allegedly *discriminatory nature* of the employment decision taken against him. Martí

can not be expected to have taken action before he "was or should have been aware

that he was being unlawfully discriminated against . . . ." *Provencher v. CVS*

*Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 14 (1ˢᵗ Cir. 1998). Indeed, Martí

argues that he only became aware of the discriminatory nature of Defendants' actions

on September 9, 1995, the day on which he received the letter denying his request for

reconsideration of his dismissal. Unfortunately for Martí, even taking this factual

assertion as true, Martí certainly *should* have been aware of the alleged discrimination

well before September 9, 1995.

Martí should have been aware of the alleged discrimination against him

because at the time of his proposed termination, he knew all of the facts relevant to his

belief that he was being discriminated against. Martí alleges that he was aware of

rumors about SAC Schwein's dislike for Hispanics and his desire to replace Hispanic

agents with Anglo-Saxon agents. Martí further alleges that he was aware that SAC

Schwein commenced a campaign of ethnicity-based hostility against Martí upon SAC

14

Civil No. 96-1653 (HL)

Schwein's arrival at the San Juan FBI office.[6] In spite of this, Martí alleges that it was not until he received from the FBI the letter denying his request for reconsideration that he appreciated the discriminatory nature of his dismissal.[7] Regardless of this allegation, Martí simply should have been aware of the alleged discrimination before this time.

Martí attempts to explain his neglect by arguing that he was misled into not taking legal action. Thus, according to Martí, equitable tolling should create an exception to the strict enforcement of the 45-day deadline. First, he alleges that he consulted ASAC Pesquera in the wake of the November 16, 1994 letter. ASAC Pesquera, Martí claims, counseled him not to worry about his concerns about SAC Schwein's possibly discriminatory role in Martí's looming dismissal.

Second, Martí alleges that he also consulted SAC Schwein. SAC Schwein denied having any involvement with the FBI's proposed decision to terminate Martí. Martí further alleges that SAC Schwein communicated to him an interest in helping him appeal the proposed termination and suggested that Martí resign rather than being

_____

[6] According to Martí, this campaign included unfair criticism of his performance and derision of his English language skills. Although discrimination on the basis of one's language or accent can ground a Title VII claim for national origin discrimination, Martí's claim is time-barred. See *Smothers v. Benitez*, 806 F.Supp. 299, 307-08 (D.P.R. 1992).

[7] Martí claims that he was made even more acutely aware of the discriminatory nature of his termination when he learned in early October of 1995 that an Anglo-Saxon agent named Bradley Meads had been appointed to his former position as Principal Legal Advisor of the San Juan FBI office. This is irrelevant to Martí's timing argument, though, as he claims that he became fully aware of the discriminatory nature of his termination on September 9, 1995.

15

Civil No. 96-1653 (HL)

dismissed.

1    Martí's allegations, however, are not sufficient to invoke equitable tolling.  For

2    Martí to be entitled to equitable tolling, he must allege

3

4        at the least, not only that he had no reason to be aware of his employer's
         improper motivation when the putative violation occurred, but also that
5        the employer actively misled him and that he relied on the (mis)conduct
         to his detriment.
6

7    *Jensen v. Frank*, 912 F.2d 517, 521 (1ˢᵗ Cir. 1990).  ASAC Pesquera's counsel to

8    Martí, however unwise, does not constitute active misleading.  Neither does SAC

9    Schwein's denial of responsibility for Martí's proposed termination involve any active

10   misleading that would in any way impede Martí's ability take legal action regarding

11

12   his proposed termination by the FBI.  Further, SAC Schwein's professed interest in

13   helping Martí, even if disingenuous, did not actively mislead Martí from consulting an

14   EEOC counselor.  Finally, in light of the fact that Martí has asserted that he was

15   aware of SAC Schwein's alleged anti-Hispanic predilections, Martí can not argue that

16

17   he had *no reason* to be aware of SAC Schwein's improper motivation when Martí

18   learned of his proposed dismissal (taking as true Martí's allegation that SAC Schwein

19   was even involved in his dismissal).

20   Martí argues in his Opposition to Defendants' Motion to Dismiss Plaintiff's

21

22   Amended Complaint, that the continuing violation doctrine prevents his Title VII

23   claim from being time-barred.  Martí makes the conclusory assertion that "[a]s stated

24   in his Amended Complaint, defendants have participated in a series of continuing

25

26                                      16

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

violations of his rights." Dkt. No. 23. Martí then proceeds to set forth a version of

the requirements for making out a continuing serial violation. Martí neglects,

however, to allege facts that support his claim of a continuing violation. In fact, after

setting forth the requirements for showing a continuing serial violation, Martí simply

wends his way through a confusing recitation of few facts and many conclusions,

none of which support his continuing violation theory. See *Rogan v. Menino*, 175

F.3d 75, 77 (1st Cir. 1999) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)

(holding that "bald assertions, unsupportable conclusions, periphrastic

circumlocutions, and the like need not be credited")); *Lowell v. City of Judge*, 160

F.3d 67, 78 (1st Cir. 1998); *Massachusetts School of Law at Andover, Inc. v. American*

*Bar Ass'n*, 142 F.3d 26, 39 (1st Cir. 1998); *Correa-Martinez v. Arillaga-Belendez*, 903

F.2d 49, 52 (1st Cir. 1990).

        Even assuming that Martí had coherently argued for the existence of a

continuing violation, Martí has not alleged facts sufficient to support a continuing

violation. A continuing violation can be either serial or systemic. *Provencher*, 145

F.3d at 14. A continuing serial violation "occurs where a chain of similar

discriminatory acts emanating from the discriminatory animus exists and where there

has been some violation within the statute of limitations period that anchors the earlier

claims." *Provencher*, 145 F.3d at 14. See also, *Thomas v. Eastman Kodak Co.*, 183

F.3d 38, 53-54 (1st Cir. 1999), *cert. denied*, 120 S.Ct. 1174 (2000). Martí has simply

not pointed to any discriminatory act within the limitations period. The only events

17

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

that occurred during the limitations period were Martí's receipt of the letter denying

his request for reconsideration and Martí's finding out that Bradley Meads had been

appointed to Martí's former position.  Martí's receipt of the letter is "[m]erely [the]

residual effect[] of past discriminatory conduct . . . [and is] not [itself an] act[] of

discrimination and therefore will not satisfy the anchor violation requirement."

*Provencher*, 145 F.3d at 5.

A continuing systemic violation, on the other hand, is based not on a series of

discriminatory acts but rather on "a discriminatory policy or practice." *Provencher*,

145 F.3d at 14 (quoting *Jensen*, 912 F.2d at 523).  Further, "so long as the policy or

practice itself continues into the limitation[s] period, a challenger may be deemed to

have filed a timely complaint." *Id.*  Unlike a continuing serial violation, a continuing

systemic violation "requires no identifiable act of discrimination during the limitations

period." *Provencher*, 145 F.3d at 14.  Here, though, Martí has failed to argue the

theory of a continuing systemic violation.  Thus, the Court shall not decide whether

such a violation exists in this case.  See *Cruz-Erazo v. Rivera-Montañez*, – F.3d –,

2000 WL 490828, 7 n. 3 (1ˢᵗ Cir. 2000) (stating that when a litigant has failed to raise

a legal argument, "we think neither [the district nor the circuit] court is obliged to

dream up and articulate [litigants'] arguments for them").

The foregoing analysis leads to the ineluctable conclusion that the 45-day

period started to run when Martí was informed of his dismissal on March 6, 1995.  It

is undisputed that Martí did not seek EEOC counseling until October 23, 1995, over

AO 72
(Rev 8/82)

Civil No. 96-1653 (HL)

seven months later. Martí's Title VII claim is thus time-barred.[8]

1                              **Conclusion**

2          The Court hereby grants Defendants' Motion to Dismiss Martí's claim of

3

4    deprivation of property without due process of law, his claim of deprivation of liberty

5    without due process of law, his equal protection claim, and his Title VII claim.

6    Accordingly, all of Martí's claims are hereby dismissed with prejudice. Judgment

7
     shall be entered accordingly.
8

9

10   **It Is So Ordered,**
     At San Juan, Puerto Rico        _____
11   June 14, 20r.o)                 HECTOR M. LAFFITTE
                                     Chief U.S. District Judge
12

13

14

15

16

17

18

19

20   ─────────────────

21        [8] The Court notes that although reasonable minds could differ as to the fairness of
     Martí's dismissal, the Court's role is to determine whether Martí has a legally cognizable
22   cause of action and not to decide whether he was fairly treated or not.. See *Feliciano de la
     Cruz v. El Conquistador Resort and Country Club*, – F.3d –, 2000 WL 709928, 5 (1st Cir.
23   2000) (pointing out that an "unfair" dismissal alone can not ground a Title VII claim and that
     Title VII "was not designed to transform courts into 'super personnel departments, assessing
24   the merits – or even the rationality – of employers' nondiscriminatory business decisions'"
25   (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991))).

26                                      19

AO 72
(Rev 8/82)